IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>ADAM MICHAEL CADE-GILSON,<br><br>    Defendant. | No. CR14-2035<br><br>REPORT AND RECOMMENDATION |

## TABLE OF CONTENTS

I.    *INTRODUCTION* .................................... 2

II.   *PROCEDURAL HISTORY* ............................. 2

III.  *ISSUE PRESENTED* ................................ 2

IV.  *RELEVANT FACTS* ................................. 2

V.   *DISCUSSION* ..................................... 5
     A.   *Probable Cause* ............................. 6
          1.   *Rear License Plate* ..................... 6
          2.   *Air Freshener* ......................... 12
     B.   *Reasonable Suspicion* ..................... 15

VI.  *SUMMARY* ....................................... 19

VII. *RECOMMENDATION* ................................ 20

## I. INTRODUCTION

On the 19th day of August, 2014, this matter came on for hearing on the Motion to Suppress (docket number 21) filed by the Defendant on August 8, 2014. The Government was represented by Special Assistant United States Attorney Lisa C. Williams. Defendant Adam Michael Cade-Gilson appeared in person and was represented by his attorney, Max S. Wolson.

## II. PROCEDURAL HISTORY

On July 23, 2014, Defendant Adam Michael Cade-Gilson was charged by Indictment with possession of firearms and ammunition by a felon. Defendant appeared on July 30, and entered a plea of not guilty.[1] Trial was scheduled before Chief Judge Linda R. Reade on September 29, 2014.

On August 8, 2014, Defendant timely filed the instant motion to suppress. The Government filed its resistance on August 18. Defendant filed a post-hearing reply on August 20.

## III. ISSUE PRESENTED

Defendant, a convicted felon, was charged after two handguns and ammunition were found in his vehicle during a traffic stop on May 2, 2014. Defendant argues that the stop lacked probable cause or reasonable suspicion and, therefore, the evidence must be suppressed.[2]

## IV. RELEVANT FACTS

In February 2014, Officer Nicholas Berry of the Waterloo Police Department, who is currently assigned to the Tri-County Drug Enforcement Task Force, received

---

[1] At his initial appearance, Defendant advised the Court that his true name is Adam-Cade Michael Gilson.

[2] Defendant does not challenge the lawfulness of any actions taken by law enforcement *after* the stop was initiated.

information that Samuel Hirsch was involved in the distribution of methamphetamine from his home. Officers started conducting surveillance, including "drive-bys" at the Hirsch residence. During the next few weeks, Berry developed a "secondary source" that was used to conduct a "controlled payment" to Hirsch.

On February 24, 2014, investigators used the secondary source to contact Hirsch and order a quantity of methamphetamine. Officers observed Hirsch leave his residence, enter a vehicle, and then leave the area, together with a second vehicle. Officer Berry and other investigators followed Hirsch to the meeting place and seized a quantity of methamphetamine from Hirsch. The driver of the second vehicle was identified as Jennifer Zavala. A search warrant was obtained for Hirsch's house, resulting in the seizure of between two and three ounces of methamphetamine, over $11,000 in cash, and other evidence of drug distribution, including drug ledgers, packaging, and scales.

Jennifer Zavala, the driver of the second vehicle, was questioned repeatedly during the days following February 24. Zavala had been staying for a period of time at the Hirsch residence. Zavala admitted that she had a source who was obtaining large quantities of methamphetamine, which she would then give or sell to Hirsch. According to Zavala, who has "ties" to the Fort Dodge area, she stopped providing Hirsch with methamphetamine following February 24.

Investigators learned from "a couple of other sources" that Hirsch was continuing to distribute methamphetamine from his residence after February 24, although in smaller quantities. As part of his investigation, Officer Berry attempted to find out information regarding Hirsch's family, acquaintances, and other contacts. On May 2, 2014, Berry observed a silver Cadillac Escalade parked at Hirsch's residence, which he had not seen before. By calling in the license plate, investigators learned that the registered owner was Joshua Pendleton. The address on the registration was Carroll, Iowa, but Berry was told

by dispatch that the address on Pendleton's driver's license was Fort Dodge.[3] According to Berry, Carroll and Fort Dodge are "in close proximity."

Officers conducted surveillance on the residence and observed people leaving the residence and "mingling" around and in the Escalade. Jennifer Zavala was not observed at the scene, and, because of the Fort Dodge connection, Officer Berry believed that the driver of the vehicle may be Hirsch's new drug source. Officers briefly left the area, but when Berry returned a short time later, the vehicle was gone. Berry then found the vehicle at a nearby convenience store. The driver of the vehicle, who was later identified as Defendant, was gassing the vehicle, while a female passenger appeared to be emptying trash.

When the Escalade left the convenience store, Officer Berry followed. He pulled up directly behind the vehicle when it stopped at a stop light. At that time, Berry "observed that the license plate sat lower and partially blocked some of the letters for the county and then also almost three quarters of the actual registration sticker." Berry acknowledged that he was able to read the county name, but testified that he was unable to read the registration sticker. Berry, who was in plain clothes and driving an unmarked vehicle, then called another law enforcement agency to conduct a vehicle stop.

Tama County Deputy Sheriff Casey Schmidt testified that shortly after 6:00 p.m. on May 2, 2014, he was contacted by Officer Berry. Berry advised Schmidt that he was following a vehicle southbound on Highway 63 that was going to be entering Tama County, and that he would like the vehicle stopped. Berry told Schmidt that "some sort of instrument or device was hanging from the rearview mirror of the vehicle and that the plate was also obscured." Schmidt located the vehicle at approximately 6:30 p.m. and initiated a traffic stop. Prior to pulling the vehicle over, Schmidt did not observe any

---

[3] When an investigator with the Federal Defender's Office conducted an on-line search on August 19, 2014, however, Pendleton's address was shown in Carroll, Iowa.

speeding or erratic driving. Schmidt noticed, however, that half of the county name on the license plate was not visible, and he could not read the registration sticker. Schmidt observed something hanging from the rearview mirror, but "could not make out exactly what it was due to the tinted window in the rear window."

Both parties introduced photographs depicting the rear license plate area and rearview mirror area on the vehicle Defendant was driving. Government's Exhibit 1 and Defendant's Exhibit D-4 show that the bottom portion of the word "Carroll," representing the county of registration, is blocked by a "step" which appears to be built in to the Escalade's bumper. While neither party offered precise measurements, the Court estimates that approximately the bottom one-third of the letters is obscured. The bumper-step also obscures approximately one-half of the registration sticker which is found in the lower lefthand corner of the license plate. Government's Exhibit 2 and Defendant's Exhibit D-2 depict a Christmas tree-style air freshener hanging from the rearview mirror located near the middle of the windshield.

## V. DISCUSSION

Defendant asserts that all of the evidence in this case "was obtained as a result of an unconstitutional stop of his vehicle in violation of Defendant's Fourth Amendment rights." In response, the Government argues that there was probable cause to believe the driver of the vehicle had committed one or more statutory violations and, alternatively, reasonable suspicion existed to believe the driver, or his passenger, were involved in the distribution of narcotics.

The law regarding vehicle stops is well-established. "A traffic stop is a seizure within the meaning of the Fourth Amendment and, as such, must be supported by reasonable suspicion or probable cause." *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008). "Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012) (quoting *United*

*States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008)). If probable cause is lacking, an investigative stop still does not violate the Fourth Amendment "if the police have reasonable suspicion that the vehicle or its occupants are involved in criminal activity." *United States v. Bell*, 183 F.3d 746, 749 (8th Cir. 1999). "If reasonable suspicion exists, officers may briefly detain a vehicle and its occupants to conduct a reasonable investigation." *United States v. Zamora-Lopez*, 685 F.3d 787, 790 (8th Cir. 2012).

### A. Probable Cause

I will first examine the issue of whether probable cause existed to initiate the traffic stop. The Government argues that Deputy Schmidt had probable cause to believe that the driver was violating two traffic laws: first, the county name and the registration sticker on the rear license plate were partially obstructed; and second, the air freshener hanging from the rearview mirror did not permit the driver to have "clear vision."

### 1. Rear License Plate

As described above, the rear license plate on the Escalade was displayed such that the rear bumper covered approximately the bottom one-third of the county name, and covered approximately one-half of the annual registration sticker. Iowa Code § 321.166 establishes the specifications for "vehicle registration plates." The registration plates must be made of metal and of a size not to exceed six inches by twelve inches. § 321.166(1). Every registration plate must display a registration plate number and the state name, and must "display the name of the county," with certain exceptions not applicable here. § 321.166(2). In addition, the year and month of expiration of registration must be displayed on the vehicle registration plate using a "validation sticker" prescribed by the Department of Transportation. § 321.166(7).

Iowa Code § 321.37(1) requires the registration plates to be attached to the motor vehicle, one in the front and the other in the rear. The plate must be securely fastened in a horizontal position at a height of not less than 12 inches from the ground, measuring

from the bottom of the plate, "in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be clearly legible." § 321.38. "It is unlawful for the owner of a vehicle to place any frame around or over the registration plate which does not permit full view of all numerals and letters printed on the registration plate." § 321.37(3). The "validation sticker" specifying the month and year of expiration of the registration plate must be displayed on the rear registration plate. § 321.34(2)(a).

Here, the Government argues:

> Reading the statutes together, Iowa law requires a motor vehicle to display a rear license plate which contains an annual valid registration sticker. The license plate must be maintained in a condition to be clearly visible, clearly legible, and must be maintained free from foreign material. The license plate's county name, registration sticker, plate number, and issuing state must be clearly visible/clearly legible.

Government's Opposition (docket number 24) at 5. Defendant argues that he did not have any "frame around or over the registration plate" and, in any event, "all information on the plate was easily readable."[4]

In recent years, the Iowa appellate courts have addressed alleged license plate violations on several occasions. In *State v. Peden*, 766 N.W.2d 649 (Table), 2009 WL 606236 (Iowa App.), an officer noticed that the digits on the defendant's license plate were blurred, when looking at it from an angle, because of the construction of the license plate cover. When the officer pulled directly behind the defendant, however, he was able to read the plate from that perspective. The district court denied the defendant's motion to suppress, finding the officer had probable cause to make the traffic stop. The defendant argued that neither Iowa Code § 321.37 nor § 321.38 "provides any requirements as to angles or distances from which the license plate must be legible and viewable." *Id.* at *1.

---

[4] Defendant's Brief (docket number 21-1) at 7.

The Iowa Court of Appeals rejected the defendant's argument, finding that "[t]he statutes plainly state that the license plate must be in full view, clearly visible, and clearly legible. A license plate that is legible only from certain angles does not comply with these requirements." *Id.*

In *State v. Tyler*, 830 N.W.2d 288 (Iowa 2013), the Court considered whether a tinted license plate cover provided probable cause to stop a motor vehicle. The officer testified that when he pulled behind the subject vehicle, the license plate cover obstructed his view of the plate. According to the officer, "the license plate was 'blurred' and that he could not read the plate when he had initially turned on his lights." *Id.* at 291. The officer acknowledged, however, that after stopping the vehicle, and prior to making contact with the driver, he "was able to view all of the numbers and letters printed on the rear license plate, saw the 'Iowa' printed at the top of the license plate, observed the county displayed on the bottom of the plate, and had a full view of the registration sticker." *Id.* at 290-91. In finding that the vehicle stop was unlawful, the Court noted that tinted license plates are not a violation of Iowa law. *Id.* at 295. The Court questioned the officer's credibility regarding the "blurred" license plate, and found that because all of the information on the plate was visible, there was neither probable cause nor reasonable suspicion to stop the vehicle.

In *State v. Jensen*, 839 N.W.2d 675 (Table), 2013 WL 4769370 (Iowa App.), the Court considered whether probable cause existed to stop a vehicle when a frame over the rear registration plate blocked the state name from view. "It was not until the deputy approached the car on foot that he could see 'Wisconsin' written on the plate." *Id.* at *1. The defendant argued that because "the big numbers and letters" were visible, his license plate complied with Iowa Code § 321.37(3). *Id.* at *3. The Iowa Court of Appeals rejected the argument, however, noting that "the statute says 'all' letters printed on the registration plate" must be in full view. *Id.*

8

The Iowa Supreme Court recently took up the same issue in *State v. Harrison*, 846 N.W.2d 362 (Iowa 2014). The question in *Harrison*, as framed by the Iowa Supreme Court, was: "Are police officers permitted to stop a motorist because his license plate frame covers up the county name?" *Id.* at 363. In *Harrison*, the Jeep's license plate frame covered up the county name on the license plate. The Court held that "a license plate frame that covers up the county name violates Iowa Code § 321.37(3) and provides a valid basis for a traffic stop." *Id.*

Iowa Code § 321.37(3) provides:

> It is unlawful for the owner of a vehicle to place any frame around or over the registration plate which does not permit full view of the numerals and letters printed on the registration plate.

In finding that probable cause existed to stop the defendant's vehicle, the Court concluded that the plain language of the statute refers to "all" numerals and letters on the plate. This necessarily included the county name. The plain language of the statute also requires "full view" of the numerals and letters. Apparently, the county name was completely obscured in *Harrison* and, therefore, the Court did not address that part of the statute. I believe, however, that the Iowa Supreme Court would conclude that "full view" is not satisfied when a part of the numerals or letters are partially obstructed. That is, it seems clear that if a frame is placed around or over the license plate in a way which partially obstructs the county name, thus preventing its "full view," there is a violation of § 321.37(3).

Defendant argues in this case, however, that § 321.37(3) is inapplicable because it is limited, by its terms, to the placement of "any frame" around or over the license plate. I agree. In finding probable cause to stop the vehicle in *Harrison*, the Iowa Supreme Court applied the "plain language" of § 321.37(3). Specifically, the Code requires that "all" numerals and letters be in "full" view. By its plain language, however, § 321.37(3)

9

makes it unlawful to place "any frame around or over the registration plate" which does not permit full view of all of the numerals and letters. While "frame" is not defined in Iowa Code Ch. 321, I do not believe it includes a factory-installed bumper. Accordingly, I do not believe there was a violation of § 321.37(3).

That conclusion does not, however, end the analysis. Iowa Code § 321.38 requires a license plate to be attached "in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be clearly legible." That is, Iowa law requires (1) the plate be in a place and position to be clearly visible; (2) the plate be maintained free from foreign materials; and (3) the plate be in a condition to be clearly legible. In *Harrison*, the Court noted that "Iowa Code sections 321.38 and 321.388 [regarding illumination] demonstrate that the legislature intended that all information to be displayed on a license plate must remain readable." *Id.* at 368. As stated by the Court in *Harrison*, "[w]hy permit motorists to cover up information on license plates they are required to display?" Clearly, if a motorist covered some portion of the license plate (such as the county name) with duct tape, it would be unlawful. I believe if the license plate is not "clearly legible" for any reason, it violates § 321.38. In *State v. Klinghammer*, 779 N.W.2d 495 (Table), 2010 WL 200058 (Iowa App.), at *3, the Court noted that "a license plate obscured for any reason, defeats its very function." *See also State v. Miller*, 670 N.W.2d 432 (Table), 2003 WL 22015974 (Iowa App.) (holding that an obscured license plate alone furnished probable cause for a vehicle stop).

In support of his argument that there was no statutory violation, Defendant relies heavily on *United States v. $45,000.00 in U.S. Currency*, 749 F.3d 709 (8th Cir. 2014). There, a divided panel interpreting Nebraska law concluded that when the officer testified that he was able to read the license plate when he got within 100 feet, there was no violation of a statute requiring the letters and numbers to be "plainly visible." In reviewing the Nebraska cases, the Court concluded that Nebraska law equated "visibility"

with "readability." Because the officer conceded that the partially obscured state name was readable by him prior to the stop, there was no probable cause to believe the statute had been violated and, therefore, the vehicle stop was unlawful. In a vigorous dissent, Chief Judge Riley found that a reasonable officer could conclude that the partially obstructed letters of the state name were not "clear and distinct . . . so that they [were] plainly visible," thereby establishing probable cause to believe the statute was violated. *Id.* at 723-24 (quoting *Neb.Rev.Stat.* § 60-399(2)).

I believe the holding in *$45,000.00* is distinguishable from the instant action for at least a couple of reasons. First, the Nebraska statute requires the information on the plate to be "plainly visible." The Iowa statute requires the license plate to be "clearly visible" — which is functionally equivalent — and also requires the information on the plate to be "clearly legible." The Iowa Supreme Court in *Harrison* stated that all information on the license plate "must remain readable." *Harrison*, 846 N.W.2d at 368. While it may be argued that the county name in this case was "readable" by an experienced law enforcement officer in this state, the annual registration sticker (which is required by statute to be on the plate) was not. Second, the officer in *$45,000.00* testified that he was able to decipher the partially-obstructed state name when he got within 100 feet of the defendant's vehicle. In this case, however, both officers testified that they were unable to read the annual registration sticker, even at close range.

Iowa Code § 321.38 requires the license plate to be placed in a position to be "clearly visible" and in a condition to be "clearly legible." Citing § 321.38, the Iowa Supreme Court found that "the legislature intended that all information to be displayed on a license plate must remain readable." *Id.* The *Harrison* Court also emphasized the importance of all letters and numerals on the plate, including the county name. Presumably, the annual registration sticker — whose display is also mandated by statute — is at least as important as the county name. I conclude that when a portion of the

county name and/or annual registration sticker is obstructed and not legible/readable for any reason, it is a violation of § 321.38. Because any traffic violation, no matter how minor, establishes probable cause to stop a vehicle, there was probable cause to initiate the traffic stop in this case.[5]

### 2. Air Freshener

As set forth above, I believe that the partial obstruction of the county name and the annual registration sticker on the rear license plane provided probable cause to stop Defendant's vehicle. If the district court agrees, then it need go no further. If the district court disagrees with my conclusion in that regard, however, then it must consider the Government's alternative argument that the air freshener hanging from Defendant's rearview mirror violated Iowa Code § 321.438(1).

Iowa law prohibits a person from driving a motor vehicle "equipped with a windshield" which does not permit "clear vision." Iowa Code § 321.438(1) states: "A person shall not drive a motor vehicle equipped with a windshield, sidewings, or side or rear windows which do not permit clear vision." Defendant argues that it is "not altogether clear" that § 321.438(1) proscribes items hanging from a rearview mirror. The Government argues that § 321.438(1) applies whenever a driver does not have "clear

---

[5] In a post-hearing reply brief, Defendant argues that because Officer Berry refers to Iowa Code § 321.37 in his Incident Report (Defendant's Exhibit A) as a basis for pulling Defendant over, the Government cannot now rely on § 321.38 to establish probable cause, citing *United States v. Guevara*, 731 F.3d 824 (8th Cir. 2013). The Court does not read *Guevara* in the same way. The *Guevara* Court found that it did not matter that the district court relied on a different statute than the one the trooper cited to the driver when he pulled her over, because he had probable cause to make the traffic stop for "a reason he did articulate to Guevara at the time of the stop." *Id.* at 828-29. Like the officer in *Guevara*, Deputy Schmidt told the Defendant the reason for the stop and, as set forth above, the reason given establishes probable cause.

vision" of the road, "whether that vision is obstructed by cracks in the windshield or foreign objects obstructing the view."[6]

There appears to be only one Iowa appellate case interpreting § 321.438(1). In *State v. Moreno*, 2014 WL 2600282 (Iowa App.), an officer observed a slow-moving vehicle with a rear window "completely covered with frost or ice which obscured the driver's vision." *Id.* at *2. Citing Iowa Code § 321.438(1), the Iowa Court of Appeals concluded that "the officer had probable cause to stop the car." Because *Moreno* involved a rear window which *itself* did not "permit clear vision," rather than an object hanging inside the car, it does not resolve the issue of whether an object hanging from a rearview mirror may have violated § 321.438(1).

In *United States v. Murillo-Figueroa*, 862 F. Supp. 2d 863 (N.D. Iowa 2012), the Court considered whether air fresheners hanging from a rearview mirror established probable cause for a violation of § 321.438(1). There, an officer stopped a vehicle after observing numerous air fresheners hanging from the rearview mirror.[7] Judge Bennett adopted the report and recommendation of Chief Magistrate Judge Zoss, concluding that the four or five air freshener trees, three or four inches in length, hung from a rearview mirror of the defendant's vehicle "did not prevent a 'clear vision' through any of the vehicle's windows." *Id.* at 869.[8] Judge Zoss did not address the threshold question of whether § 321.438(1) is even implicated by objects hanging from a rearview mirror.

---

[6] Government's Brief (docket number 24) at 8.

[7] Photographs of the rearview mirror and air fresheners in *Murillo-Figueroa* were introduced in this case as Defendant's Exhibit C.

[8] Nonetheless, Magistrate Judge Zoss concluded, and Judge Bennett agreed, that the vehicle stop was valid because officers had probable cause, or at least a reasonable suspicion, that defendant was transporting drugs in his vehicle. 862 F. Supp. 2d at 869.

In support of its argument, the Government cites two Eighth Circuit cases interpreting Nebraska law: *United States v. Arciniega*, 569 F.3d 394 (8th Cir. 2009), and *United States v. Ramos-Caraballo*, 375 F.3d 797 (8th Cir. 2004). In *Arciniega*, the defendant's vehicle was stopped when an officer noticed "a large oval air freshener" hanging from the rearview mirror. Similarly, the vehicle in *Ramos-Caraballo* was stopped when the officer observed "a seven-and-three-quarters-inch long air freshener shaped like a tree and still partially enclosed in its original packaging" hanging from the rearview mirror. In both cases, the Eighth Circuit Court of Appeals found probable cause to stop the vehicle. It should be noted, however, that the applicable Nebraska statute makes it unlawful to operate a motor vehicle "with any object placed or hung in or upon such vehicle" so as to "obstruct or interfere" with the operator's view through the windshield or preventing the operator from "having a clear and full view of the road." *Id.* at 801 (citing Neb.Rev.Stat. § 60-6,256). That is, the Nebraska statute specifically prohibited objects hung in the vehicle which "interfere" with a "full view" of the road. The *Ramos-Caraballo* Court noted that the Nebraska statute demonstrated that "any obstruction (not only a *significant* obstruction) of a clear and full view of the road is a safety hazard subject to regulation through this statute." *Id.* (italics in original).

The Government also cites my report and recommendation in *United States v. Geary*, 2010 WL 667916 (N.D. Iowa). In that case, the defendant was arrested in Arizona when a trooper observed what appeared to be a "navigation system" mounted on the windshield of the vehicle, approximately ten inches below the rearview mirror. The defendant asked that all evidence deriving from the traffic stop in Arizona be suppressed. Accordingly, I examined Arizona law, which prohibited a person from operating a motor vehicle "with an object or material placed, displayed, installed, affixed or applied on the windshield," or similarly "applied in or on the motor vehicle" in a manner which "obstructs or reduces a driver's clear view" through the windshield or other windows. *Id.*

at *1, n.2 (citing Ariz.Rev.Stat. § 28-959.01(B)). Finding that the 20-square inch object affixed to the windshield "reduced" the driver's clear view, I found that there was probable cause to stop the vehicle.

Absent any Iowa authority on point, I conclude that § 321.438(1) has no application to objects hanging from a rearview mirror. Unlike the Nebraska statute, which prohibits hanging objects, § 321.438(1) prohibits the operation of a vehicle "equipped" with a windshield or other windows which "do not permit clear vision." There is no evidence in this case that the windshield *itself* did not permit clear vision. I believe the Government's argument that § 321.438(1) extends to "foreign objects obstructing the view" stretches the terms of the statute beyond their plain meaning.

Even *if* § 321.438(1) is properly construed to include foreign objects hanging from a rearview mirror, however, I do not believe that the single air freshener in this case prohibited "clear vision." While "clear vision" is not defined in the Iowa Code, I agree with Judge Zoss that it must mean something more than the minimal obstruction caused by a single air freshener. *Murillo-Figueroa*, 862 F. Supp. 2d at 869 (finding that four or five air freshener trees three or four inches in length hung from a rearview mirror "did not prevent a 'clear vision' through any of the vehicle's windows"). Accordingly, I believe that § 321.438(1) did not provide probable cause to stop Defendant's vehicle.

## B. Reasonable Suspicion

The Government argues that even if probable cause was lacking to stop the vehicle, the officers had reasonable suspicion to believe the driver, or his passenger, were involved in the distribution of narcotics. An investigative stop does not violate the Fourth Amendment "if the police have reasonable suspicion that the vehicle or its occupants are involved in criminal activity." *Bell*, 183 F.3d at 749. "If reasonable suspicion exists, officers may briefly detain a vehicle and its occupants to conduct a reasonable investigation." *Zamora-Lopez*, 685 F.3d at 790. The "reasonable suspicion" standard is

less "rigorous" than the "probable cause" standard. *Houston*, 548 F.3d at 1153. The Court considers the totality of the circumstances in determining whether the police had reasonable suspicion to stop the vehicle. *Bell*, 183 F.3d at 749. "To be reasonable, suspicion must be supported by 'specific and articulable facts.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

Turning to the facts in the instant action, officers had substantial evidence to believe that Samuel Hirsch was involved in the distribution of methamphetamine from his home. A search of Hirsch's house on February 24, 2014, resulted in the seizure of between two and three ounces of methamphetamine, over $11,000 in cash, and further evidence of drug dealing. Following the search on February 24, officers received information that Hirsch was continuing to distribute methamphetamine from his residence.

On May 2, 2014, Officer Berry observed a silver Cadillac Escalade parked at Hirsch's residence, which he had not seen before. Officers conducting surveillance on the residence observed people leaving the residence and "mingling" around and in the Escalade. By calling in the license plate, investigators learned that the registered owner was Joshua Pendleton, a person not known to the investigators. The address on the registration was Carroll, Iowa, although Berry testified that he was told by dispatch that the address on Pendleton's driver's license was Fort Dodge. (An on-line search by an investigator on August 19, 2014, showed Pendleton's address at that time in Carroll, Iowa.) Hirsch's previous source, Jennifer Zavala, had "ties" to the Fort Dodge area. Because he was told that the registered owner of the Escalade had a Fort Dodge address on his driver's license, Berry suspected that the driver of the vehicle may be Hirsch's new source.

In a nutshell, the Government argues that because the vehicle was seen parked outside a known drug house, and because persons from the house were seen "mingling" with the occupants of the vehicle, there was reasonable suspicion to believe that the

vehicle's occupants were involved in criminal activity. I disagree. There is no evidence that the occupants of the vehicle were engaged in any suspicious activity. That is, officers surveilling the scene did not report any activity which resembled drug dealing. After the vehicle left the scene, it was observed at a convenience store, with its occupants engaged in routine activities. The vehicle was followed for approximately 20 minutes before being pulled over and no suspicious activity was observed. I believe that Officer Berry's suspicion that the occupant of the vehicle may be Hirsch's new drug source was nothing more than an unparticularized hunch. That is, I do not believe the totality of the circumstances supports a reasonable suspicion that the vehicle's occupants were engaged in criminal activity.

The cases cited by the Government in its brief are unpersuasive. For example, in *United States v. Spotts*, 275 F.3d 714 (8th Cir. 2002), officers stopped the defendant's truck as he drove by a residence where a search was being conducted. The defendant argued that evidence seized from the truck should be suppressed because the stop was not supported by the reasonable suspicion required by *Terry v. Ohio*. *Id.* at 716. The Court rejected the defendant's argument and affirmed his conviction. However, the facts in *Spotts* are distinguishable from those in the instant action. Spotts' vehicle was seen at the property on the night before the search. During surveillance preceding the search, officers observed what appeared to be drug transactions. At one point, officers observed a vehicle registered to Spotts stop in the alley behind the garage. Officers observed Spotts standing in the alley next to the truck, when he bent down and shone a light underneath the truck. *Id.* at 717. The police also possessed several "intelligence reports" stating that Spotts was distributing methamphetamine in the area. Officers obtained a search warrant and, approximately three hours after the search began, Spotts' truck returned to the scene. Officers spotted Spotts driving by the house and instructed him to stop. Clearly, the facts

supporting "reasonable suspicion" to stop the vehicle in *Spotts* far exceeds the facts allegedly supporting "reasonable suspicion" in the instant action.

The Government also cites *United States v. Harvey*, 897 F.2d 1300 (5th Cir. 1990), which was cited with apparent approval in *Spotts*. There, officers stopped an individual who drove up in the alley adjacent to a house where a search was being conducted and, upon frisking the driver, discovered a loaded handgun. In *Harvey*, the warrant apparently provided for the arrest of the occupant of the house "and any other persons making entry into the location or making their escape." *Id.* at 1303. The district court concluded that the warrant was invalid insofar as it authorized the arrest of persons entering or exiting the premises, but nevertheless concluded that the officers who arrested the defendant were acting in good faith reliance on the warrant. The Seventh Circuit Court of Appeals found it unnecessary to address the good faith reliance argument, because *Terry v. Ohio* granted police officers "the authority to search a person for weapons where the police officer has reason to believe that the person with whom he is dealing is possibly armed and dangerous." *Id.* That is, the Court's focus was not on whether the vehicle was lawfully stopped, but whether the occupant was lawfully searched. It provides the Court with little guidance here.

Finally, the Government cites *United States v. Horne*, 4 F.3d 579 (8th Cir. 1993). There, officers executed a search warrant at the defendant's home. After obtaining the search warrant, but prior to its execution, officers learned from the narcotics unit that the defendant drove a white mini-van that he used in his drug business. When officers arrived to execute the warrant, they saw the mini-van parked on the street directly in front of the house. Drugs were found in the vehicle. Approximately two weeks later, a second search warrant was executed by United States marshals, looking for a federal fugitive. More drugs were found in the house. The occupants of the house described the source of the drugs and described the vehicle he was driving. Later that day, when officers *were*

executing a third search warrant that permitted a more detailed search of the house, officers observed a man matching the physical description of the source drive up to the house in a vehicle described by the occupants. The man started to walk toward the front door, but then turned and walked away. Officers stopped the man and searched the car. The Eighth Circuit Court of Appeals concluded that the officers had probable cause to arrest the man and search the vehicle incident to arrest. *Id.* at 589. Again, the information known to the officers in *Horne* far exceeded the information known to the officers in the instant action.

I believe the information known to Officer Berry prior to the vehicle stop in this case did not provide "specific and articulable facts" to support a reasonable suspicion that the vehicle's occupants were engaged in criminal activity. Merely parking in front of a known drug house, and even interacting with occupants of the house, does not, in my view, support reasonable suspicion to stop a vehicle. Rather, Officer Berry's belief that the occupant of the vehicle may be Hirsch's new drug source was merely an unparticularized hunch.

## VI. SUMMARY

In summary, while the partially obstructed county name and annual registration sticker on Defendant's rear license plate do not constitute a violation of Iowa Code § 321.37(3) (prohibiting the placement of any "frame" around the plate which does not permit "full view" of all numerals and letters on the plate), it is a violation of § 321.38, (requiring the plate to be "in a place and position to be clearly visible"). Accordingly, officers had probable cause to believe there was a traffic violation and, therefore, the vehicle stop was lawful. *If* the district court concludes that there was *not* a violation of § 321.38, however, then I believe there was no probable cause or reasonable suspicion to stop the vehicle. That is, I do not believe the air freshener hanging from the rearview mirror provided probable cause to find a violation of § 321.438(1). Furthermore, Officer

Berry's belief that the occupants of the vehicle may be Hirsch's new drug source was a mere hunch and, in my view, the facts known to him at the time did not rise to the level of "reasonable suspicion."

## VII. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the Motion to Suppress (docket number 21) filed by the Defendant be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on August 19, 2014.*

DATED this 29th day of August, 2014.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA